No. 37,477

THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF SEDGWICK, *Plaintiff*, v. GEORGE W. ROBB, Auditor of the State of Kansas, *Defendant*, THE BIG SLOUGH DRAINAGE DISTRICT of Sedgwick County et al., Intervenors.

No. 37,478

THE CITY OF WICHITA, *Plaintiff*, v. GEORGE W. ROBB, Auditor of the State of Kansas, *Defendant*, THE BIG SLOUGH DRAINAGE DISTRICT of Sedgwick County et al., Intervenors.

(199 P. 2d 530)

 Opinion filed November 13, 1948.

*W. F. Lilleston* and *Wayne Coulson,* both of Wichita, argued the causes, and *L. A. Hasty, Fred W. Aley, Lawrence E. Curfman* and *Howard T. Fleeson,* all of Wichita, were with them on the briefs for the plaintiffs.

*Edward F. Arn,* attorney general, and *William Paul Timmerman,* assistant attorney general, were on the briefs for the defendant.

*W. D. Jochems* and *J. Wirth Sargent,* both of Wichita, argued the causes, and *Emmet A. Blaes, Roetzel Jochems, Robert G. Braden* and *S. C. Durbin,* all of Wichita, were with them on the briefs for the intervenors.

The opinion of the court was delivered by

THIELE, J.: The questions herein determined arise out of ·two applications for writs of mandamus. Acting under the authority of Laws 1945, chapter 391, as amended by Laws 1947, chapter 202, now appearing as G. S. 1947 Supp. 19-3301 *et seq.,* and usually referred to hereafter as chapter 391, Sedgwick county and the city of Wichita each issued one temporary note under the provisions of G. S. 1947 Supp. 10-123, and presented it to the auditor of the state of Kansas for registration, preliminary to its sale under the requirements of G. S. 1935, chapter 10, article 1, and such registration being refused the instant proceedings were commenced originally in this court by each of the above municipalities.

In a preliminary way it may be said that in each case the principal question raised is the constitutionality of chapter 391, and as later appears the questions for decision are generally common to each proceeding. For convenience the constitution of the United States will be referred to as the federal constitution and the constitution of Kansas as the state constitution. There is no contention that the proceedings leading up to the issue of each note are irregular

if chapter 391 authorizing them is valid, and we do not note those proceedings which are alleged in some detail in the applications for the writs of mandamus. Alternative writs were issued directing the auditor to register the notes or to show cause why he should not, and he has answered alleging in substance that chapter 391 is unconstitutional and void because in contravention of article 11, section 1, of the state constitution providing for a uniform rate of taxation, in contravention of the fourteenth amendment of the federal constitution and the above provision of the state constitution because it permits taxation of property not subject to flood hazard, and in contravention of article 2, section 17, of the state constitution as being special legislation where a general law could have been made applicable, and, insofar as the county is concerned, that chapter 391, section 2, requires the city clerk and the city treasurer to act for the county and is an unlawful delegation of power.

Three drainage districts of Sedgwick county, six townships of the county and seven individuals alleging themselves to be taxpayers in the county, were given leave to intervene, and filed a common answer in both proceedings alleging facts with reference to the situation of each intervenor, making certain admissions and denials, raising the same constitutional objections as are included in the auditor's answer, and alleging further the statute violates article 12, section 4, of the state constitution pertaining to appropriation of rights of way.

With the issues thus joined the plaintiffs moved the court to determine in advance of trial issues of law as stated in thirteen specified questions.

These questions were fully argued orally and are fully discussed in the printed briefs. It is not necessary that they be set forth. What is said hereafter under appropriate reference covers the matters urged.

A brief review of the statute involved discloses that the title to chapter 391 as originally enacted in 1945 was, "An act relating to the construction of flood control works in certain counties and cities," and that by section one it is effective in "any county of the state of Kansas traversed or touched by the Arkansas river." The act provides that where the federal government undertakes flood-control works within the county, the board of county commissioners may enter into certain undertakings with the federal government to hold the United States of America free from any damage; to main-

tain, keep in repair and operate the flood-control works and to furnish the necessary lands, rights of way and easements. Right of eminent domain is conferred upon the county "to be exercised in the manner prescribed by article 2 of chapter 26 of the General Statutes of 1935 and acts amendatory thereof or supplemental thereto." Provision is made for the issuance of bonds to pay the cost of acquiring rights of way or easements, and for the issuance of bonds without an election, the aggregate of such bonds not to exceed one-half of one percent of "the assessed valuation of the county," and it is the duty of the board of county commissioners "to make an annual levy on all the taxable property in such county for the retirement" of the bonds. It is, also provided that for the purpose of maintaining and operating such flood control works as shall be constructed by the United States, the board of county commissioners shall be empowered "to make an annual tax levy upon all of the tangible property within said county." The last section of the act as originally enacted stated that except as therein otherwise expressly provided, all rights, powers, authority and jurisdiction conferred on counties and boards of county commissioners are also conferred upon and vested in any city located in any county such as described in the act and upon the governing body thereof. This section was amended in 1947. For present purposes, however, it is noted the important difference between counties and cities is in the percentage of the amount of bonds that may be issued, and in the rate for which taxes may be levied to provide funds for maintenance and operation. For acquisition of lands, rights of way and easements, the city "may issue general obligation bonds of the city to pay the costs thereof and expenses connected therewith in the manner now provided by law" and for the purpose of maintenance and operation "the governing body of such city shall be empowered to make an annual tax levy upon all the taxable tangible property within said city." A reference to the entire act will disclose that the construction of any flood-control works is determined and performed by the United States, the county or city entering into agreement (1) to hold the United States free from damage to persons or property resulting from construction or after completion; (2) to maintain and operate the works; and (3) to furnish all necessary lands, rights of way and easements, all as provided in the statute. The county, or city as the case may be, does not determine the extent or cost of the improvement, nor does it tax anyone therefor other than as stated. It may also be noted

that there is no provision in the act for making special assessments upon any real estate that may be benefited by the improvement and in proportion to such benefit. Whether the act fixes the entire county or the entire city as a taxing district to pay demands upon it under the act is noticed later.

In asking this court to rule on the questions submitted, the obvious purpose is to procure a declaration as to the soundness and validity of the several claims of unconstitutionality asserted in the answers of the defendant and of the intervenors. In view of the principle that constitutionality of a statute is presumed, and that the burden of establishing the contrary is on those asserting it (see cases mentioned in West's Kansas Digest, Constitutional Law, § 48, and Hatcher's Kansas Digest, Constitutional Law, § 16) and further for the reason the brief of the intervenors covers not only the same contentions made by the defendant state auditor, but others as well, we shall discuss generally the contentions as presented by the intervenors including but not making separate reference to the brief or contentions of the state auditor, except where necessary.

The greater part of the intervenors' brief is devoted to a discussion of questions 1, 2 and 8, which raises the questions that chapter 391 is unconstitutional because (1) it violates the fourteenth amendment to the federal constitution; (2) article 11, section 1, of the state constitution; and (3) it provides for the payment of bonds by general taxation upon all taxable property within the county (or city).

Limits of space prevent any detailed statement of facts alleged in the answer or as summarized in the brief, as a basis for intervenors' argument. Generally, they direct attention to the fact that the drainage districts have made improvements at a large cost; that certain individual intervenors own lands not subject to flood damage; that the water table will be lowered under the lands of others and their damage will be difficult of ascertainment; that another owns land subject to overflow but the improvement is not on his land; that all are affected by being taxed but will receive no benefit; that the amount of lands flooded comprise only a small fraction of the lands to be taxed; that personal property will be taxed notwithstanding the only property to be benefited is real estate; that no direct benefits are conferred on property outside the .flooded area; that the project gives sanction to construction for the benefit of private as well as public property; that certain public utili-

ties will be compensated for damages but not charged with benefits; that certain bridges are omitted from the project and that the amount of bonds permitted is not sufficient to pay the amount charged to the county (or city).

Insofar as unconstitutionality under the state constitution is concerned the intervenors and the defendant rely principally on *Putnam v. City of Salina,* 136 Kan. 637, 17 P. 2d 827 (Reh. den. 137 Kan. 731, 22 P. 2d 957), stressing particularly language appearing on page 641 that an obvious infirmity in the statute (R. S. 12-645) was that it gave sanction to the construction of a project of flood control for the benefit of private as well as public property, the cost whereof was to be met by levy of a general tax upon all the city. When the Putnam case was decided the statute had been amended, and the discussion was only to meet a contention that its inclusion *rendered* the entire original act unconstitutional and not subject to amendment which cured the claimed defect. The contention was not sustained. Notwithstanding the language stressed by intervenors, the court recognized that the rule is that taxation must be for a public and not merely a private purpose, that the taxes must be properly apportioned and the district taxed must have a special interest in and be specially benefited by the thing for which the taxes are levied. (See p. 647 and syl. ¶ 4.) It is noted also that the statute there under discussion provided for the creation of a particular benefit district, and, in view of what is later said herein, it may be doubted that the case is very much in point.

In *Roby v. Drainage District,* 77 Kan. 754, 95 Pac. 399, it was recognized that the legislature has power to create drainage districts and provide for assessments, and that when the nature of the case does not conclusively fix it, the power to determine what shall be a taxing district for a particular project is a legislative power, restricted only by constitutional limits.

In *Railroad Co. v. Leavenworth County,* 89 Kan. 72, 79, 130 Pac. 855, wherein the constitutionality of a drainage act (Laws 1905, ch. 215) was involved, this court recognized the act provided two methods, one by special assessment and one by general tax upon the taxable property of the district; that in adopting the latter, there was no requirement, as in case of special assessments, for notice and that a special notice or hearing "is not essential to a valid levy of a general tax in a taxing district legally created." And see, also, *Johnson County Comm'rs v. Robb,* 161 Kan. 683, 693, 171 P. 2d 784, and cases cited.

Insofar as unconstitutionality under the federal constitution is concerned the intervenors, as well as plaintiffs, rely principally upon *Houck v. Little River District,* 239 U. S. 254, 60 L. Ed. 266, 36 S. Ct. 58, and quote from it at length. In that case the question was whether a flat tax over the entire district to defray preliminary expense violated constitutional rights and it was held that it did not and that Houck was not deprived of his property without due process of law and in violation of the fourteenth amendment of the federal constitution. We cannot here quote at length, as do the intervenors, stressing particular words or phrases, clauses or sentences on which they rely. In that case however the court said:

"In view of the nature of this enterprise it is obvious that, so far as the Federal Constitution is concerned, the State might have defrayed the entire expense out of state funds raised by general taxation or it could have apportioned the burden among the counties in which the lands were situated and the improvements were to be made. *County of Mobile v. Kimball,* 102 U. S. 691, 703, 704. It was equally within the power of the State to create tax districts to meet the authorized outlays. The legislature, unless restricted by the state constitution, can create such districts directly, or, as in this case, it may provide for their institution through a proceeding in the courts in which the parties interested are cited to appear and present their objections, if any. The propriety of a delegation of this sort was a question for the State alone. And with respect to districts thus formed, whether by the legislature directly or in an appropriate proceeding under its authority, the legislature may itself fix the basis of taxation or assessment, that is, it may define the apportionment of the burden, and its action cannot be assailed under the Fourteenth Amendment unless it is palpably arbitrary and a plain abuse. These principles have been established by repeated decisions." (Citing authorities.) (p. 262.)

Intervenors state that the first sentence is dictum, but we note it was quoted approvingly in *Valley Farms Co. v. Westchester,* 261 U. S. 155, 67 L. Ed. 585, 43 S. Ct. 261. As bearing on the correctness of the principle stated in the above quotations see *Williams v. Eggleston,* 170 U. S. 304, 311, 42 L. Ed. 1047, 18 S. Ct. 617; *Mt. St. Mary's Cemetery v. Mullins,* 248 U. S. 501, 63 L. Ed. 383, 39 S. Ct. 173; *Milheim v. Moffat Tunnel Dist.,* 262 U. S. 710, 721, 67 L. Ed. 1194, 43 S. Ct. 694; and *Chesebro v. Los Angeles Co. Dist.,* 306 U. S. 459, 83 L. Ed. 921, 59 S. Ct. 622.

Although many other state and federal decisions are mentioned in the briefs which are not set forth here, they have been examined. We are of the opinion the true rule is that the legislature may exercise its discretion in fixing a taxing district and that its action in

so doing is not open to judical inquiry unless it is wholly unwarranted and a flagrant abuse, and by its arbitrary character is a mere confiscation of particular property.

Although it is contended by the intervenors that no taxing district was fixed by the act, we cannot agree. There is nothing in the act that warrants any assumption the board of county commissioners have any power to create districts within the county, or that the governing body has any such power as to territory within the city. While there is no categorical statement in the act that the county and the city constitute taxing districts, that they are such is clearly evident from language used in the act fixing bond and tax levy limitations which, without exception, are spread over the whole county or the whole city, as the case may be.

On the proposition that the creation of the districts in such manner is wholly unwarranted and a flagrant abuse, resulting in a mere confiscation of property, the intervenors rely principally upon *Myles Salt Co. v. Iberia Drainage Dist.*, 239 U. S. 478, 60 L. Ed. 392, 36 S. Ct. 204, L. R. A. 1918E 190. In that case it had been alleged that the inclusion of a certain "island" was not upon any theory that a general scheme of drainage would benefit all of the lands taxed, even indirectly, but for the sole purpose of subjecting it to taxation. Under the circumstances of that case the allegation stood undenied, and the court held the inclusion of the island was the result of power arbitrarily exerted, imposed a burden without a compensating advantage and that it resulted in confiscation of property of Myles in violation of its rights under the fourteenth amendment.

Intervenors direct attention to *Morton Salt Co. v. City of South Hutchinson*, 159 F. 2d 897, in support of their contention that the proposed tax upon all of the property in the taxing district is palpably arbitrary and a plain abuse. The action in the district court was to enjoin issuance of waterworks bonds. In the circuit court of appeals the question was the right of plaintiff to a preliminary injunction pending a final disposition of the cause in the district court. Although reference is made to the opinion for a more complete statement, in general it was contended that a tax for waterworks construction, forty-six percent of which would be assessed against plaintiff's property which would receive no benefit from it, was palpably arbitrary and a plain abuse of power. It was held that the test of due process in respect to taxation under the four-

teenth amendment to the federal constitution is whether the taxing power exerted bears fiscal relation to the protection, opportunities and benefits given, and that where the tax imposed clearly results in such a flagrant and palpable inequality between the burden imposed and benefits received that it amounts to an arbitrary taking of property without compensation, it violates the due process clause. A reference to the opinion shows however that the court clearly recognized that the fourteenth amendment places only "extremely limited" restrictions upon the taxing power of a state, and that the federal constitution does not require precise equality or uniformity of taxation; that "it is no constitutional defense to a tax that the taxpayer is not directly benefited thereby, or is less benefited than others who pay the same or less tax"; that absolute equality of taxation is unattainable, but a law, the manifest purpose of which is discrimination and inequality, cannot be sustained. Authorities are cited in support of the several principles asserted. We quote only the following paragraph of the opinion:

"[17] The benefits conferred may be direct and tangible, such as the paving of the street in front of taxpayer's residence or business, a water or sewer line to his door; or, it may be indirect and intangible, such as a waterworks or sewer system which, although unavailable to the taxpayer, nevertheless redounds to the benefit of the whole community of which he is a part. Certainly the tax is no less constitutional because the benefit conferred is indirect and intangible."

On the question that direct benefits are not required, see *Miller & Lux v. Sacramento Drainage Dist.*, 256 U. S. 129, 65 L. Ed. 859, 41 S. Ct. 404.

Notwithstanding some of the allegations of the intervenors' answer as to particular factual situations, we must take note of the fact that the Arkansas river enters Sedgwick county at its northwest corner and making somewhat of a curve to the east and then southeast passes out of the county about six miles west of the southeast corner of the county; that it flows through the west edge of the city of Wichita; that if not restrained in some manner it not only damages public property, but interferes with public business by impeding progress from either side of the river to the other and in and out of the city by those having business not only at the county courthouse, but with various state and federal offices thereof, as well as with other institutions whose activities are in the public interest. Neither can we accede to any contention that only real estate within so-called flood limits will receive a benefit. What is said above demonstrates that such is not the case. Even if there

were doubt about it, the legislature must be presumed to have surveyed the field and concluded that improvement without the city was for the benefit of the county as a whole and the improvement within the city was for the benefit of the city as a whole. To take isolated cases and say that one property owner, or a small group, will not be directly benefited, does not compel a contrary conclusion. Uninterrupted means of transportation from any part of the county or city to a public or semipublic institution in another part of the county or city is a benefit even though a beneficiary may not exercise his right to it. In our opinion, it may not be said the act is unconstitutional as being arbitrary, or confiscatory of private property, or that under its terms it results in taxation of one who does not receive some benefit from the tax.

We note also some argument by the intervenors that some of them may suffer consequential damages which they say they may not recover. Assuming that to be true, it would not render the act unconstitutional. In any event, we are not disposed at this time to rule on just what damages may be included in the undertaking between the county or city on the one hand and the federal government on the other to "hold the United States of America free from any damage to persons or property resulting during construction or after the completion thereof." (Laws 1945, ch. 391, § 1, *id.*, § 7, as amended by Laws 1947, ch. 202, § 1, all appearing as G. S. 1947 Supp., ch. 19, art. 33.)

With reference to questions 1, 2 and 8, we conclude that chapter 391 is not unconstitutional as depriving taxpayers of their right of due process of law under the fourteenth amendment of the federal constitution, nor their rights under article 11, section 1, of the state constitution, nor because it provides for the payment of bonds issued thereunder by general taxation upon all taxable property within the county (or city) for any of the reasons above mentioned.

Question No. 3 is whether chapter 391 is unconstitutional because it violates article 2, section 17, of the state constitution for the reason it is special legislation. Intervenors direct special attention to the constitutional language that "in all cases where a general law can be made applicable, no special law shall be enacted." The gist of their argument is that it having been determined that the Arkansas river is a navigable river (*State, ex rel., v. Akers*, 92 Kan. 169, 140 Pac. 637, Ann. Cas. 1916B 543, affirmed in *Wear v. Kansas*, 245 U. S. 154, 62 L. Ed. 214, 38 S. Ct. 55) the act could have been

made general by substituting the word "navigable" for the word "Arkansas" as used in section one of the act; that there was just as much reason for passing a law which would affect the Kansas, Marais des Cygnes and Neosho rivers; that the effect of the language used is to limit the act to a part only, and therefore it is a special law where a general law could have been enacted. In support the intervenors direct attention only to *Barker v. Kansas City*, 149 Kan. 696, 88 P. 2d 1071, syl. ¶ 1 (*a*), where it is said, *inter alia*, that,

"If a law of general form operates uniformly on all members of the class to which it applies, it is not open to the objection it is a special law if the classification is not an arbitrary and capricious one."

The state auditor directs our attention to *Owens v. City of Coffeyville*, 151 Kan. 263, 98 P. 2d 415; *Panhandle Eastern Pipe Line Co. v. Miami County Comm'rs*, 151 Kan. 533, 99 P. 2d 828; *State, ex rel., v. Allen County Comm'rs*, 156 Kan. 248, 133 P. 2d 165; *Berentz v. Comm'rs of Coffeyville*, 159 Kan. 58, 152 P. 2d 53; and *Carson v. Kansas City*, 162 Kan. 455, 177 P. 2d 212, in each of which this court held a statute void because of unreasonable classification. Reference to the Kansas Digests will disclose a great number of cases, some of which are mentioned in the plaintiffs' brief, in which the matter of classification as made in particular cases has been under discussion. We need not review any of them here for none disputes the holding in *State, ex rel., v. Allen County Comm'rs*, supra, where a number of our decisions are cited, that:

"The legislature has power to pass laws which apply to and operate uniformly on all members of a class, but the classification created must be natural and genuine. The classification cannot be an arbitrary or fictitious one but must be based upon distinctions which have a reasonable and substantial relation to the subject matter involved." (Syl. ¶ 1.)

The rule stated was expressly approved in *Berentz v. Comm'rs* of *Coffeyville*, supra.

Essentially the question in determining the character of the legislation is: Does the act apply to and operate uniformly on all members of the class, and is the class created a natural and genuine one, or is it arbitrary and fictitious, not based upon distinctions having a reasonable and substantial relation to the subject matter involved? If the act meets that test the legislation is general. Intervenors and the auditor contend the classification is arbitrary and unreasonable. In *Borden's Co. v. Baldwin*, 293 U. S. 194, 209, 79 L. Ed. 281, 55 S. Ct. 187, the supreme court, in an opinion by Hughes, C. J., said:

"When the classification made by the legislature is called in question, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of the existence of that state of facts, and one who assails the classification must carry the burden of showing by a resort to common knowledge or other matters which may be judicially noticed, or to other legitimate proof, that the action is arbitrary. *Lindsley v. Natural Carbonic Gas Co., supra; Clarke v. Deckebach*, 274 U. S. 392, 397; *Lawrence v. State Tax Comm'n*, 286 U. S. 276, 283." (p. 209)

The following must have been apparent to the legislature when it considered and finally enacted chapter 391. The Arkansas river enters Kansas at its western boundary and traverses or touches thirteen counties of the state in its course of hundreds of miles within the state and before it flows into the state of Oklahoma. Generally it has low banks and runs through a broad alluvial and sandy plain. Along or close to its course within the state are at least six cities having over five thousand inhabitants each, which includes Wichita, the largest city in the state. It is the only navigable stream of its type within the state, and problems connected with its flood protection vary materially from those along the Kansas river, the only other river in the state comparable in size. We need not speculate on whether the legislature may have considered other facts, for as we view the matter the above stated ones presented a situation where it could make a valid classification. Neither the intervenors nor the state auditor have pleaded any facts, nor directed attention to any matter of common knowledge or of which judicial notice should be taken, which would sustain any burden upon them to show the classification so made was arbitrary. It cannot be said the act does not operate uniformly on all members of the class included. The only contention is that to limit the act to counties traversed or touched by the Arkansas river contravenes our state constitution. For reasons given we cannot sustain that contention.

Question No. 4 is whether chapter 391 is unconstitutional or unenforceable as violating article 12, section 4, of our state constitution, which provides that "No right of way shall be appropriated to the use of any corporation, until full compensation therefor be first made in money, or secured by a deposit of money, to the owner, . . ." Intervenors direct our attention to their allegation of the estimated cost and the amount that can be raised within the tax limitations and argue that the estimate of cost exceeds the amount that may be raised and that neither the county nor the city can be

said to be a solvent corporation financially able to comply with the requirements of chapter 391. In our opinion the statute is neither unconstitutional nor unenforceable. Waiving any discussion that the constitutional provision has no application to a public corporation (*Railway Co. v. City of Hiawatha*, 95 Kan. 471, 148 Pac. 744, and *Sullivan v. City of Goodland*, 110 Kan. 359, 203 Pac. 732) we note the following: Whether any sufficient right of way may be purchased with available funds presents no constitutional question. Whether the right of way for the proposed improvements can be purchased with the moneys available does not present a matter for judicial determination (*Kansas Power Co. v. City of Washington*, 145 Kan. 962, 67 P. 2d 1095, and *Lewis v. City of South Hutchinson*, 162 Kan. 104, 174 P. 2d 51). Cases cited dealing with the cash basis law are not in point. Nor can we consider the intervenors' argument that certain bridges must be replaced and the cost thereof included. The court is not the arbiter of the extent of the improvement. In the present status of the case we have before us only an estimate of the cost and an assessed valuation which may or may not exist when the right of way is acquired. We must assume that at the proper time the plaintiffs will each observe the statutory limitations placed upon them. Our answer to question No. 4 is that chapter 391 does not contravene article 12, section 4, of our state constitution and that it is not unenforceable on the ground urged under this heading.

The fifth question is whether chapter 391 is unconstitutional as violating article 2, section 1, of the state constitution, which provides that the legislative power of this state shall be vested in a house of representatives and senate. In their answer intervenors pleaded that provision that the act was operative in counties where the corps of engineers of the United States army shall be authorized by the congress to construct works, and that this made the act contingent upon the action of congress and delegated the legislative power of the state to the congress of the United States. In their brief intervenors state they have been unable to find any authority so holding. Without following out plaintiffs' argument, we think it must be held the contention of unconstitutionality cannot be sustained. We think under the analogy to be drawn from *City of Pittsburg v. Robb*, 143 Kan. 1, 53 P. 2d 203, the operation of the act being made contingent upon the action of the congress warrants no conclusion there was any delegation of legislative power.

Intervenors concede they find no authority to support their allegations which form the basis for the sixth question: Does the fact that the construction of the project would, as to certain intervenors, make the route of highway travel longer, render chapter 391 unconstitutional and void? We are of opinion that under cases cited by plaintiffs, *Heller v. Atchison, T. & S. F. R. Co.*, 28 Kan. 625; *Anderson v. Cloud County*, 83 Kan. 419, 111 Pac. 464; *Borton v. Mangus*, 93 Kan. 719, 145 Pac. 835, L. R. A. 1915D 142; *Bohan v. Sumner County Comm'rs*, 131 Kan. 87, 289 Pac. 436, and cases cited therein, the answer to the question must be in the negative.

The seventh question: Would the fact the construction of the project might lower the level of subterranean water under lands not adjacent to a ditch to be constructed render the statute unconstitutional or void, has been answered in part in our discussion of questions 1, 2 and 8. We shall not discuss this question further than to say that the extent of damages some intervenors may be able to recover does not present a situation involving constitutionality of chapter 391.

Under question No. 9 we are asked to determine whether chapter 391 is invalid in that it enables plaintiffs to interfere with and usurp the corporate functions of the intervening drainage districts and townships. We need not review the allegations of the intervenors' answer as to expenditures made either by the drainage districts or the townships, nor their contention that right of eminent domain having been exercised by them, neither of the plaintiffs may so exercise that right as to interfere with improvements already made, in the absence of express statutory authority to that effect. Neither need we set forth the argument of plaintiffs. A short answer is that both drainage districts and townships are creatures of the legislature and neither has any rights in a case such as is before us that the legislature may not alter at its pleasure. We think it clear from the act that the legislature considered the construction of works for the prevention or mitigation of floods or flood hazards by the United States of America and the right of the county or city as the case may be "to acquire such lands, rights of way, or easements as may be necessary" (ch. 391, § 2) were paramount to the needs and rights of the several townships or drainage districts, existing within the limits of or affected by the project. Chapter 391 is not invalid for the reason asserted by the intervenors.

The tenth question is, "Does the fact as alleged in paragraph 44

of intervenors' answer that as yet the congress has appropriated only a part of the estimated federal cost of the project constitute any defense to the allowance of a peremptory writ?" Intervenors present no argument on this question. We noted in discussing question four that whether the improvement can be made with moneys available does not present a matter for judicial determination. And it may be further stated that we cannot assume the United States of America will not make good commitments which it has made as an inducement to the county (and city) to proceed.

Intervenors state they have not been able to find any authority on question 11, which is: Does the fact the plaintiff county and the city of Wichita have contracted to furnish separate segments of the necessary right of way for the project constitute any defense to allowance of a peremptory writ as claimed in paragraph 48 of intervenors' answer? A study of chapter 391 will disclose no provision for joint operation by the county and city—rather it will disclose an authorization for the county to contract with the United States of America, under conditions stated, and a like grant of authority to the city. The flood control works is in essence a single improvement. Lacking any statutory authority to permit them to join and act in one concerted proceeding, it was proper that the two governing bodies agree on the extent of right of way to be acquired by each in performing its agreement with the United States of America in order that there be no doubt of extent of liability occasioned either by overlapping or gapping in the necessary right of way. If the question of the extent of the two segments presents a justiciable question, that question is not before us. Question No. 11 is answered in the negative.

The twelfth and thirteenth questions pertain only to the county and will be considered together. They are: (12) Is chapter 391 void because it gives the county the right of eminent domain as provided in G. S. 1935, ch. 26, art. 2; and (13) in exercising the right by the county under that statute, does the county board act through the city clerk and the city treasurer or the corresponding county officers? It is observed that the statute last mentioned pertains to condemnation in cities.

The answer to question No. 12 is "No." Legislation by reference is not unconstitutional. See *State, ex rel., v. Davis, Governor,* 116 Kan. 663, 229 Pac. 757, where this court upheld the constitutionality of Laws 1923, ch. 144, under which the Revised Statutes of 1923

were adopted. In *State v. Shawnee County*, 83 Kan. 199, 110 Pac. 92, it was held the legislature may extend the provisions of an existing statute to a new subject by appropriate reference to such statute in the new act, without violating the constitution, and in so doing it is not necessary that any particular formula be employed. (See syllabus ¶¶ 1 and 4 and corresponding parts of the opinion.)

Answering question 13, the following is to be observed: In the statute the language used is that the county shall exercise the right of eminent domain "in the manner prescribed by article 2 of chapter 26 of the General Statutes of 1935." It is not at all clear that if a very literal meaning was attached to the language the legislature could not have placed the duties upon the city offices named in the general statutes of 1935 without violating any constitutional provision, for these offices are the creatures of the legislature and it may fix their duties. But we think that is not a proper interpretation. The legislature was aware that the county clerk was the keeper of the records, papers and seal of the county (G. S. 1935, 19-304), and that the county treasurer was the custodian of county funds (G. S. 1935, 19-506) and that proceedings involving collection and payment of moneys, and of the proceedings in connection therewith would ordinarily be found in these two offices and that those offices would be the ones sought for information in any condemnation proceedings instituted by the county. We are of opinion that the legislature in using the phrase "in the manner" meant only to say that in county condemnations under chapter 391 the same duties performed by the city clerk and city treasurer in city condemnations were to be performed by the county clerk and county treasurer in county condemnations. And the same observations are applicable to publications necessary to be made. As bearing on the question see also *State v. Shawnee County*, supra.

Summarizing, we hold that chapter 391 is not unconstitutional for any reason presented by the answer of the auditor of the state of Kansas or by the answer of the intervenors, as mentioned and determined above.

In his brief, the auditor makes it clear that his refusal to register the notes tendered was not due to obstinacy but to his belief that as a state official he should not register the notes until the legal questions presented had been determined, and that if those questions are decided favorably to the plaintiffs, there is no reason why they should not have the relief for which they asked. It is appar-

ent also that the factual situation alleged by the intervenors is not sufficient in law to justify refusal of the relief sought by the plaintiffs. In this situation no peremptory writ will issue unless it be shown later the auditor still refuses to register the notes. The costs in this court are assessed to the plaintiffs.